Phil S. Flemming (#014778)
YEN PILCH ROBAINA & KRESIN PLC
6017 North 15th Street
Phoenix, Arizona 85014
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
psf@yprklaw.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Sharon Wallace, | No. |
| Plaintiff | |
| v. | **COMPLAINT** |
| The Kroger Co., and Smith's Food & Drug Centers, Inc., d/b/a Fry's Food and Drug, | (Disability Discrimination) |
| Defendants. | **Jury Trial Demand** |

Plaintiff, Sharon Wallace ("Ms. Wallace"), by undersigned counsel, for her Complaint, alleges as follows:

**NATURE OF ACTION**

1.    This is an action seeking money damages and equitable relief for violations of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq*., and the Arizona Civil Rights Act, Ariz. Rev. Stat. § 41-1463*, et seq*., related to Ms. Wallace's employment with, and wrongful termination from employment by The Kroger Company; and Smith's Food & Drug Centers, Inc., d/b/a Fry's Food and Drug (collectively "Fry's).

**PARTIES, JURISDICTION, AND VENUE**

2.    Ms. Wallace is a United States citizen residing in Yuma County, Arizona.

3.    Ms. Wallace is a female, over age 40, and suffers from a permanent disability in her right arm.

4.    Defendant, The Kroger Co. ("Kroger"), is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

1    5.    Defendant, Smith's Food & Drug Co. ("Smith's), a wholly owned subsidiary

2  of Kroger, is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

3    6.    Kroger owns and operates, directly and/or through Smith's, approximately

4  127 Fry's Food & Drug Stores in Arizona.

5    7.    At all relevant times, Fry's was continuously an employer within the

6  meaning of the Americans with Disabilities Act of 1990 (as amended), 42 U.S.C. §

7  12111(5), and the Arizona Civil Rights Act, Ariz. Rev. Stat. § 41-1461(7).

8    8.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this

9  action arises under the laws of the United States, specifically the Americans with

10  Disabilities Act of 1990, 42 U.S.C. § 41-1461 *et seq*.

11    9.    Supplemental jurisdiction over Ms. Wallace's state law claims is proper

12  pursuant to 28 U.S.C. § 1367.

13    10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because

14  the events giving rise to the claims occurred in this District.

15    11.    Ms. Wallace timely filed an Employment Charge of Discrimination against

16  Defendant with the Arizona Attorney General's Office and EEOC on June 8, 2020.

17    12.    Ms. Wallace received a Notice of Right to Sue from the EEOC on March 10,

18  2023, and timely commenced this action within ninety-days of its receipt.

19    13.    Ms. Wallace requests a trial by jury in this matter.

20                              **FACTUAL BACKGROUND**

21    14.    Ms. Wallace commenced employment with Fry's on November 17, 1993, as

22  a cashier.

23    15.    Over her nearly thirty-year career with Fry's, Ms. Wallace rarely missed

24  work, developed a loyal customer base, accumulated hundreds of daily achievement

25  stickers, and loved her job.

26    16.    On April 13, 1998, Ms. Wallace suffered a workplace injury to the elbow

27  (right lateral epicondylitis) while standing on a pallet attempting to pull a crate down.

28  ///

17.    Ms. Wallace was placed on light duty and no bagging work while she sought medical treatment and physical therapy.

18.    Although her position remained "cashier," her work duties were primarily facing product and other duties that did not require lifting.

19.    On February 24, 1999, orthopedic surgeon, John H. Serocki, M.D., with (Self-insured) Alexis Risk Management, provided Fry's "Permanent and Stationary Evaluation" stating that Ms. Wallace suffered a right lateral epicondylitis, had "reached her point of maximum medical improvement and can be considered permanent and stationary."

20.    Dr. Serocki's evaluation stated that her disability was caused by trauma while employed by Fry's Food Store and that there was no indication of a pre-existing disability.

21.    Dr. Serocki recommended that Ms. Wallace should have a permanent light duty work restriction with no bagging.

22.    He also recommended that she be permitted to see a doctor for annual follow-up, if necessary.

23.    On April 28, 1999, Fry's corporate office requested Ms. Wallace sign a document that she understood the limitations set by Dr. Serocki, that she was to make sure that she did not exceed the limits, and that she would notify her supervisor if she had any difficulty complying with the limitations.

24.    She signed the document with the manager and assistant manager as witnesses.

25.    Ms. Wallace applied for a manager position in accounting and held the position for over 4 years.

26.    Thereafter, Ms. Wallace moved to the self-checkout station ("SCO") area which required no bagging.

27.    Ms. Wallace remained primarily at SCO for approximately ten years.

28.    Ms. Wallace was able to work a register if she had a bagger.

///

29.     On January 15, 2020, Ms. Wallace sustained a workplace injury when assistant front-end manager, Gilbert Rivera, yanked a hand scanner from her.

30.     At the time of injury, Mr. Rivera was bagging for her as she worked the register.

31.     As a result of the injury, she suffered pain and swelling in her right hand.

32.     Ms. Wallace notified Manager, Ken Mitchell, what happened and then went to lunch.

33.     When Ms. Wallace returned from lunch, Mr. Mitchell and Front-End Manager, Michael Watkins, called her into the office.

34.     She thought they wanted to talk to her about the incident with Mr. Rivera, however, instead, they interrogated her about her job performance.

35.     The following day, at the end of her shift, she was called into the office to receive an "Associate Counsel Report" for not asking a shopper if they had anything in the bottom of their cart. The Associate Counsel Report was dated the previous day, January 15, 2020.

36.     After the meeting, Ms. Wallace wrote up an injury report based on the injured hand.

37.     As a self-insured employer, after a workplace injury Fry's must provide the employee with a list of medical facilities through Medicine for Business and Industry ("MBI").

38.     As of January 21, 2020, seven days after the injury, Fry's had not provided her with the MBI list.

39.     Ms. Wallace called Frys' worker's compensation claims management provider, Sedgewick, for the MBI list but was told the store must provide it.

40.     She asked multiple times for an MBI provider, to no avail.

41.     Mr. Watkins told Ms. Wallace that there would be "repercussions" if she saw a doctor.

42.     Ms. Wallace called Sedgwick again and was denied the list of MBI facilities.

43.    Sedgewick advised that she would receive phone call the next day at an unspecified time.

44.    The next day, Ms. Wallace received a referral from Sedgewick to NextCare Urgent Care and called in sick to attend an appointment with Family Nurse Practitioner, Alex Galvez.

45.    FNP Galvez diagnosed her with right hand pain, and issued work restrictions that she "not twist," "not lift objects greater than 10 pounds," "no forceful pushing or pulling greater than 10 pounds," "limit hand over shoulders to 0 hours per day" and that she "must remain on self checkout until cleared by specialist." In addition, she was prescribed pain medication and anti-inflammatory medication.

46.    FNP Galvez also referred Ms. Wallace to an orthopedic surgeon.

47.    On January 28, 2020, Ms. Wallace was asked to sign a safety injury report prepared by Fry's Risk Manager, Beth Rau.

48.    In the report, Ms. Rau falsely stated that Ms. Wallace was injured by "handoff" of the handheld scanner, and that the injury could have been prevented by "training."

49.    Ms. Wallace disagreed with the injury report but signed it after noting "not true," on the recitation of the injury and noting that the cause was "violent aggression."

50.    Ms. Wallace asked what Mr. Mitchell meant by his statement that "training" could have prevented the injury and whether he would train people not to be violently aggressive. He responded by laughing.

51.    Ms. Wallace used another sick day on January 30, 2020, to attend the follow-up appointment at NextCare.

52.    Upon her arrival at NextCare Urgent Care, Ms. Wallace learned that Fry's insurance denied her claim. The referral to the orthopedic doctor was also denied.

53.    After learning that Fry's denied her worker's compensation claim, Ms. Wallace put together a complaint, including all events that occurred during her first workers' compensation claim in 1998 through the January 30, 2020, refusal of care.

54.    Ms. Wallace attached a copy of the "Permanent and Stationary Evaluation" from February 24, 1999, the document stating her "understanding" of the limitations signed by her, her then supervisor, and a witness, on May 8, 1999, and the medical records from NextCare indicating her work restrictions.

55.    On February 3, 2020, Ms. Wallace provided her complaint with all exhibits to Mr. Mitchell and an assistant grocery night manager as a witness. Both refused to sign.

56.    Ms. Wallace asked Mr. Mitchell to fax the documents to Fry's corporate office. He left the room, and 15 to 20 minutes later, returned stating that Ms. Wallace was no longer on the work schedule until she got her restrictions lifted.

57.    Ms. Wallace responded that she had been working with these restrictions all this time and she wanted to work.

58.    On February 4, 2020, Ms. Wallace met with Mr. Mitchell, Manager, Chris Lee, Assistant Manager, Alicia Mendez, General Merchandise Manager, Pete Tremoulis, HR Representative and her Union representative, Stalin Hernandez (along with a person named Rosa, who was unknown to Ms. Wallace).

59.    Mr. Tremoulis then interrogated her about the "Permanent and Stationary Evaluation," implying that she made it up. He stated, "you don't have an impairment" and stated ("So you don't have any more visits to Dr.'s; it doesn't say subject to annual renewal if necessary") then provided her with another Medical Questionnaire for her physician to complete.

60.    Ms. Wallace was upset since she had already submitted paperwork documenting her disability and work restrictions multiple times.

61.    The next morning, on February 5, 2020,  Mr. Hernandez, Ms. Wallace, and Mr. Tremoulis had a conference call in which Mr. Tremoulis explained that Fry's just wanted her to come back with her restrictions lifted and that they were not trying to get rid of the "Permanent and Stationary Evaluation."

///

///

62.     Ms. Wallace explained that the managers placed her permanently at SCO ten years ago as an accommodation and that she did not understand why she could not return with the same accommodations.

63.     Later that day, Ms. Wallace visited orthopedic surgeon Dr. David Levinsohn, who provided a "Disability Status Form" stating that she could return to work with the pre-existing restrictions from February 24, 1999, "light duty" "no bagging" and to remain at SCO.

64.     Ms. Wallace returned the document to Mr. Watkins, who said, "see you in the morning."

65.     When she arrived for her February 7, 2020, shift, Mr. Mitchell met her at the time clock and told her that she could not work until Mr. Tremoulis signed off.

66.     Ms. Wallace emailed Mr. Tremoulis asking what he needed and explained that she needed to return to work. That she loved her work.

67.     She reported to work on February 10 as scheduled and was told that she could not clock in because Mr. Tremoulis had not signed off.

68.     On February 12, 2020, Ms. Wallace emailed Mr. Tremoulis the Fry's Medical Questionnaire completed by Brady Olsen, N.P.

69.     She also notified Mr. Tremoulis, and Mr. Hernandez that she would report to work as scheduled on February 13.

70.     The Medical Questionnaire stated that she had an ongoing chronic condition since 1999 and that she should continue with light duty, no bagging and remain at SCO.

71.     Ms. Wallace reported for work on February 13, 2020, clocked in and worked for 15 minutes before Mr. Mitchell told her that she could not work.

72.     On February 14, 2020, Ms. Wallace emailed Mr. Tremoulis asking for help returning to work with her ongoing accommodations.

73.     On February 16 and 17, 2020, Ms. Wallace called Mr. Mitchell asking if she heard from Mr. Tremoulis and what was taking so long.

///

74.    Ms. Wallace emailed Mr. Tremoulis again on February 18 asking to return to work.

75.    On February 18, 2020, Mr. Tremoulis emailed Ms. Wallace stating that since she had an open grievance, he could not talk to her about her case and that she should contact Mr. Hernandez for those details.

76.    There was no open grievance, and she had not been notified that there was a grievance.

77.    On February 19, 2020, Ms. Wallace responded to Mr. Tremoulis, that there was no open grievance, and why he thought there was.

78.    She also emailed Fry's President, Monica Garnes notifying her of the situation and asking for help.

79.    Later that day, Mr. Tremoulis responded with a lengthy email in which he accused Ms. Wallace of falsifying the Medical Questionnaire because he could not contact the provider at the phone number listed.

80.    He demanded Ms. Wallace provide additional, unrelated information, such as whether she could bend, kneel, or stoop and what functions she could perform with her non injured hand.

81.    On February 20, 2020, Ms. Wallace responded to Mr. Tremoulis, providing him with contact information for Mr. Olsen.

82.    She also reminded Mr. Tremoulis of the explanations of her disability and accommodations as detailed in the April 1999 "Permanent and Stationary Evaluation" and the February 5 and 12, 2020 medical reports. She asked why he needed this information again.

83.    He ignored the email, responding that he looks forward to receiving another completed Medical Questionnaire.

84.    Still unable to return to work, Ms. Wallace retained Barbara Cowan, an attorney with Workplace Advocates, to assist in returning her to work.

///

85. On March 8, 2020, Ms. Cowan sent a letter to Mr. Tremoulis citing Fry's failure to accommodate Ms. Wallace and failure to engage in a good faith interactive process.

86. She asked that Ms. Wallace be returned to her position with her previous accommodation of working at SCO or as a register clerk with a bagger.

87. On March 9, 2020, Ms. Wallace received a letter from Fry's HR Administrative Support FMLA, Natalie Bedwell, notifying her that her "Leave of Absence has been approved" and that she was on "Family Medical Leave: 2/14/20 through 3/31/20."

88. Ms. Bedwell enclosed a Leave of Absence Progress report and a Release to Work, both of which were to be completed by a physician.

89. Per Fry's Policy & Procedure, retail clerks "must" submit a written Leave of Absence Form to Human Resources in order apply for FMLA leave.

90. Ms. Wallace did not request a leave of absence, either verbally or in writing as required.

91. Ms. Wallace emailed Ms. Bedwell that she did not request a leave of absence, and enclosed Dr. Levinsohn's February 5, 2020, return to work report along with the 1999 "Permanent and Stationary Evaluation."

92. Ms. Wallace also emailed Ms. Garnes with all the medical documentation she previously provided to Fry's and requested assistance with returning to work.

93. Meanwhile, Ms. Wallace remained on the work schedule. Accordingly, she emailed Mr. Tremoulis and Mr. Hernandez and notified them she would punch in for her March 12, 2020, shift promptly at 9:00 a.m., ready to work.

94. She did not receive a response.

95. When she tried to punch in on March 12, 2020, she learned that she was removed from the system and could no longer punch in.

96. On March 20, 2020, Ms. Cowan sent a second letter to Mr. Tremoulis reminding him of her March 8 letter and requesting a response to that letter and for Ms. Wallace to be able to return to work.

97.     Mr. Tremoulis did not respond to the letter.

98.     Though she was represented by counsel, on May 5, 2020, Ms. Wallace received a certified letter from Mr. Tremoulis notifying her that Fry's had scheduled an appointment with Dr. Andrew Jarzabek on May 14, 2020, in Phoenix, Arizona, three hours from her location in Yuma, Arizona.

99.     In the letter, Mr. Tremoulis stated that if she failed to appear for the appointment, she would be separated from employment.

100.    In response to Mr. Tremoulis' May 5, 2020 letter, Attorney Cowan responded with a letter pointing out falsehoods in his letter and requesting information on "the specific tests, procedures, and/or other detailed information about the medical exam [Fry's] is requesting, so that Ms. Wallace can ensure this is not being sought for an improper purpose."

101.    Ms. Cowan copied Fry's President, Ms. Garnes and Kroger General Counsel, Christine Wheatly, on her letter and request.

102.    Neither Mr. Tremoulis nor anyone else with Kroger HQ's or Fry's division responded to Ms. Cowan's request.

103.    Instead, on May 26, 2020, Mr. Tremoulis again reached out to Ms. Wallace, knowing that she was represented by counsel.

104.    In the letter, he did not provide the requested information on "specific tests, procedures, and/or other detailed information about the medical exam [Fry's] is requesting, so that Ms. Wallace can ensure this is not being sought for an improper purpose."

105.    On June 8, 2020, Ms. Wallace filed an Employment Charge of Discrimination against Defendant with the Arizona Attorney General's Office.

106.    On July 7, 2020, Fry's terminated Ms. Wallace's employment for Job abandonment.

///

///

///

**LEGAL ANALYSIS**

**Claim One**

**(Discrimination and Failure to Accommodate under**

**the Americans with Disabilities Act, 42 U.S.C.S. § 12111, *et. seq.*)**

107.    Ms. Wallace incorporates all prior allegations as though fully set forth herein.

108.    The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against an employee based on a disability. 42 U.S.C.S. § 12112(a).

109.    To establish discrimination under the ADA, a plaintiff must show that 1) she is disabled, 2) she is qualified to perform the essential functions of the position, and 3) she suffered an adverse employment action because of her disability.

110.    The ADA prohibits an employer from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A).

111.    The elements of a failure to accommodate claim are the same as for an ADA discriminate claim. *E.E.O.C. v. Creative Networks, L.L.C.*, 912 F. Supp. 2d 828, 836-37 (D. Ariz. 2012).

112.    A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.S. § 12111(8).

113.    A disability is: (A) a physical or mental impairment that substantially limits one or more major life activities of an individual, (B) a record of such an impairment … 42 U.S.C. § 12102(1).

114.    Ms. Wallace suffers from a disability related to right lateral epicondylitis.

115.    Ms. Wallace is qualified to perform the essential functions of her position as a cashier, with accommodations, and has done for her entire career.

116.    Fry's had a record of Ms. Wallace's disability as of April 28, 1999.

117.    Beginning April 28, 1999, Fry's accommodated Ms. Wallace's disability by allowing her light duty work and no bagging, and for the last ten years of her employment she was placed at SCO where no lifting or bagging was required.

118.    Ms. Wallace suffered a workplace injury that exacerbated her permanent disability on January 15, 2020.

119.    Ms. Wallace asked to return to work with her original workplace accommodations in place, but Fry's refused.

120.    Fry's failed to engage in good faith, engage in the interactive process.

121.    Instead of reasonably accommodating Ms. Wallace's known disability, Fry's terminated Ms. Wallace from employment.

122.    As a result of Fry's failure to accommodate and ultimate termination from employment, Ms. Wallace suffered damages in an amount to be proven at trial.

**Claim Two**

**Retaliation Under the ADA**

123.    Ms. Wallace incorporates the above allegations as though fully set forth herein.

124.    An employer is prohibited from retaliating against an employee who seeks a reasonable accommodation in good faith. 42 U.S.C.S. § 12112(a); *Valtierra v. Medtronic Inc.*, 232 F. Supp. 3d 1117, 1126 (D. Ariz. 2017).

125.    To establish a prima facie case for retaliation under the ADA, a plaintiff must establish that she engaged in a protected activity, suffered an adverse employment action, and establish a causal link between the protected activity and the adverse employment action.

126.    Ms. Wallace requested a reasonable accommodation under the ADA and attempted in good faith to engage in an interactive process with Fry's.

127.    Fry's refused her request for a reasonable accommodation, removed her from the work schedule, placed her on FMLA leave without her request or consent, and

ultimately terminated Ms. Wallace's employment in retaliation for engaging in that process.

128.    As a result of Fry's retaliatory actions, Ms. Wallace suffered damages in an amount to be proven at trial.

**Claim Three**

**Discrimination and Failure to Accommodate in Violation of the**

**Arizona Civil Rights Act, Ariz. Rev. Stat. § 41-1463, *et seq*.**

129.    Ms. Wallace incorporates the allegations above as though fully set forth herein.

130.    The Arizona Civil Rights Act ("ACRA") prohibits an employer from discriminating against an employee based on a disability. A.R.S. § 41-1463 (B)(1).

131.    To establish a claim for discrimination under the ACRA, an employee must establish that she is qualified to perform the essential functions of her job, with or without an accommodation, and that she was terminated because of her disability. *Francini v. Phoenix Newspapers, Inc.*, 188 Ariz. 576,937 (App. 1996).

132.    Ms. Wallace suffers from a disability related to right lateral epicondylitis.

133.    Ms. Wallace is qualified to perform the essential functions of her position as a cashier, with accommodation, and has done so for her entire career.

134.    Fry's had a record of Ms. Wallace's disability as of April 28, 1999.

135.    Beginning April 28, 1999, Fry's accommodated Ms. Wallace's disability by allowing her light duty work and no bagging, and for the last ten years of her employment she was placed at SCO where no lifting or bagging was required.

136.    Ms. Wallace suffered a workplace injury that exacerbated her permanent disability on January 15, 2020.

137.    Ms. Wallace asked to return to work with her original workplace accommodation in place, but Fry's refused.

138.    Fry's failed to engage in good faith, engage in the interactive process.

///

139.     Instead of reasonably accommodating Ms. Wallace's known disability, Fry's terminated Ms. Wallace from employment.

140.     As a result of Fry's failure to accommodate and ultimate termination from employment, Ms. Wallace suffered damages in an amount to be proven at trial.

### Claim Four

### Retaliation under the Arizona Civil Rights Act

141.     Ms. Wallace incorporates the above allegations as though fully set forth herein.

142.     An employer is prohibited from retaliating against an employee who opposes an unlawful employment practice. A.R.S. § 41-146.

143.     Ms. Wallace opposed Fry's refusal to engage in an interactive process in good faith and Fry's refusal to provide a reasonable accommodation for her known disability.

144.     Fry's retaliated against Ms. Wallace by removing her from the schedule, placing her on FMLA leave without her request or consent, and ultimately terminating her employment.

145.     As a result of Fry's retaliatory conduct, Ms. Wallace suffered damages in an amount to be proven at trial.

**WHEREFORE,** Ms. Wallace requests Judgment against Defendant as follows:

A.     for back pay;

B.     for compensatory damages;

C.     for punitive damages;

D.     for front pay;

E.     for attorneys' fees and costs;

F.     for interest on any judgment from the date of entry of judgment until paid in full; and

G.     for any other damages or remedies the Court deems just and reasonable.

///

1    DATED this 24th day of May 2023.

2                                    YEN PILCH ROBAINA & KRESIN PLC

3

4                              By      /s/ Phil S. Flemming
                                      Phil S. Flemming
5                                     Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28